UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------X

UNITED STATES OF AMERICA,

    - against -

ALI SALEH,

          Defendant.

----------------------------------------------------X

15 Cr. 517 (WFK),
18 Cr. 468 (WFK)

**DEFENDANT ALI SALEH'S SENTENCING MEMORANDUM**

ANTHONY L. RICCO, ESQ.
20 Vesey Street, Room 400
New York, New York 10007
tonyricco@aol.com
(212) 791-3940

STEVE ZISSOU, ESQ.
42-40 Bell Boulevard, Suite 302
Bayside, New York 11361
stevezissou@stevezissouesq.com
(718) 279-4500

MICHAEL K. BACHRACH, ESQ.
276 Fifth Avenue, Suite 501
New York, New York 10001
michael@mbachlaw.com
(212) 929-0592

*Attorneys for Defendant Ali Saleh*

**<u>Table of Contents</u>**

I.  Preliminary Statement ........................................................................................................1

II.  The Charges ......................................................................................................................2

III.  Corrections/Objections to Pre-Sentence Report ...............................................................3

IV.  A sentence of no more than 300 months imprisonment is just and appropriate .................7

V.  Conclusion ......................................................................................................................16

i

## I.   **Preliminary Statement**

This memorandum is submitted for Your Honor's consideration in the sentencing of Ali Saleh in relation to his sentencing under Indict. Nos. 15 Cr. 517 (WFK), 18 Cr. 468 (WFK).  At the outset we note our belief that Mr. Saleh should be sentenced on both cases simultaneously as suggested by the Probation Department, as the Government's arguments in support of Mr. Selah's sentences in both cases overlap with each other, as do the defendant's arguments, and go beyond merely a discussion of the underlying counts of conviction.

Irrespective if Mr. Saleh's sentencing hearings proceed simultaneously or sequentially, for three principal reasons it is respectfully suggested that an aggregate sentence of no more than 300 months imprisonment would lead to the appropriate disposition of this case because: (1) Mr. Saleh has significant mental health issues, which would be better served by psychiatric treatment than prolonged incarceration or isolation; (2) while Mr. Saleh's custodial conduct has been far from stellar, such is the likely result of detaining a defendant with significant mental health issues in the MDC Special Housing Unit ("SHU"), often in isolation, for what has now been years on end, in a facility and unit that even for the most balanced inmate has been described by judges as "inhumane"; and (3) while the intent of Mr. Saleh's crimes were odorous, his ability to succeed at completing them was as disorganized, confused, and disconcerted as his mental processes.

After reviewing the facts set forth below, as well as the letters submitted on Mr. Saleh's behalf, it is respectfully requested that this Court fashion a fair and just sentence that complies with the purposes of sentencing.[1]   To that end, it is respectfully suggested that an aggregate

---

[1]    Attached collectively as "Exhibit A" are the letters from the following family and friends: Saleh Musa, Saleh Ahmed, Ahlame Ahmed, Amel Ahmed, Aneesa Ahmed, Haleema Ahmed, and Entessar Abdulla.  Please note that we have redacted the name of a minor referenced in one letter and the home addresses listed in two others. Should the Court require an unredacted copy of Exhibit A, it will be provided.

sentence on both indictments of no more than the 300 months imprisonment would take account of Mr. Saleh's mental health history and the uniquely unreasonable conditions of confinement that Mr. Saleh has endured at the MDC during the pendency of these actions, while providing Mr. Saleh with an olive branch that might help turn him down a path of redemption as he serves a lengthy, but not maximum, sentence.

## II.    The Charges

Ali Saleh comes before this Court in hope of some semblance of lenience, however small. Tormented by his own mistakes and previously undiagnosed mental health disorders, Mr. Saleh has been scarred physically and psychologically by the gruesome conditions of confinement that he has endured waiting to be sentenced.

On July 24, 2018, Mr. Saleh pleaded guilty to Counts Two and Three of a three-count Superseding Indictment (hereinafter, "the 2015 indictment"). Both counts charged Mr. Saleh with attempting to provide material support and resources to a foreign terrorist organization, specifically, the Islamic State of Iraq and the Levant ("ISIL"). Count Two charged attempts made in October 2014 and Count Three charged attempts occurring between July 2015 and August 2015.

While the intent behind Mr. Saleh's conduct in relation to the 2015 indictment was unquestionably severe, he is charged with repeated attempts with little success. Mr. Saleh's attempted conduct included: (1) multiple unsuccessful attempts to travel to Europe and the Middle East for the purpose of joining ISIL; (2) social media posts on Twitter suggesting his intent to join and support ISIL; (3) sending $500 to fund a co-conspirator's travel to Syria; and (4) driving a carload of fireworks from Indiana towards New York in a purported effort to create a car bomb, though that attempt too was abandoned before completion after his car broke down.

Thereafter, on June 3, 2019, Mr. Saleh pleaded guilty to both counts of a two-count Indictment (hereinafter, "the 2018 indictment") charging him with assaulting a guard at the MDC while he was being detained in the MDC's SHU, and possession of a makeshift knife used to assault the guard.  As in the 2015 indictment, Mr. Saleh's judgment was less than wise and his ability to succeed in his misguided tasks less than competent.

In relation to the 2018 indictment surveillance video shows Mr. Saleh reaching through the food-tray window in the door of his SHU cell, swinging his arm wildly and nicking the guard in the arm with what was later determined to be a knife.  Notwithstanding later claims to the contrary, on the video the guard does not appear to have been significantly harmed; he looks at his wrist or forearm briefly then calmly closes the food-tray window of Mr. Saleh's cell door and walks away while pushing the food cart without any hint of urgency or pain.  This description is not meant to diminish the wrongfulness of his conduct, but rather to put into perspective and solely question the extent of harm that came about from Mr. Saleh's conduct.

### III.    Corrections/Objections to Pre-Sentence Report

Before turning to the discussion of the reasons we believe a non-Guideline sentence is appropriate pursuant to 18 U.S.C. § 3553(a), Mr. Saleh requests a correction to his Pre-Sentence Report ("PSR") and raises several objections.

Mr. Saleh's PSR incorrectly states on page 3 that the maximum sentence for Count 2 of the 2018 Indictment is 20 years imprisonment, however the maximum sentence for Count 2 should be listed as *5 years imprisonment*, not 20.  See 18 U.S.C. § 1791(b)(3) ("The punishment for an offense under this section is a fine under this title or … imprisonment for not more than 5 years, or both, if the object is specified in subjection (d)(1)(B) of this section…"); 18 U.S.C. § 1791(d)(1)(B) ("As used in this section … the term 'prohibited object' means … a weapon (other

than a firearm or destructive device), or an object that is designed or intended to be used as a weapon…"); see also PSR ¶ 104 (correctly stating that the maximum term of imprisonment is 5 years for Count 2 of the 2018 Indictment).  Page 3 should be corrected accordingly.

Mr. Saleh also raises the following objections:

1.  Paragraphs 32, 40, and 49 of Mr. Saleh's PSR decline to provide Mr. Saleh with acceptance points for having pleaded guilty to either indictment.  The Probation Department argues that acceptance points should be denied because "he failed to withdraw from criminal conduct … as evidenced by his continued involvement in violent assaults at the MDC after entering his guilty plea" to the 2015 Indictment.  PSR ¶ 32, citing, Application Note 1(B), Commentary, U.S.S.G. § 3E1.1.  The Government, on the other hand, disagrees:

> The Revised PSR does not give the defendant any reduction for acceptance of responsibility in light of his failure to withdraw from criminal conduct after committing the terrorism offense.  The government does not believe that this rationale applies with respect to the defendant's plea of guilty to the prison assault and contraband changes.  Because the defendant accepted responsibility for his conduct by pleading guilty, but did so only on the morning of trial, the defendant receives a two-level reduction for acceptance of responsibility.

Gov't Sent. Memo., dated, November 8, 2021, Docket No. 18 Cr. 468 (WFK), Doc. No. 62, at 6. On this point we join the Government in our disagreement with the Probation Department.  For the reasons succinctly stated by the Government, Mr. Saleh should receive a 2-point reduction for having pleaded guilty and accepted responsibility on the morning of trial.

2.  Mr. Saleh's PSR applies a 5-level enhancement to Mr. Saleh's Guideline analysis for the 2018 Indictment "[s]ince the victim sustained a ***serious*** bodily injury," PSR ¶ 44 (emphasis added), citing, U.S.S.G. § 2A2.2(b)(3)(B), and an additional 6-level enhancement related to the same offense "[s]ince defendant was in a manner creating a substantial risk of

4

*serious* bodily injury, and … knew or had reasonable cause to believe that a person was a prison official … assaulted such official in a manner creating a ***substantial risk*** of ***serious*** bodily injury, while the defendant … was in the custody or control of a prison or other correctional facility." PSR ¶ 46 (emphasis added), <u>citing</u>, U.S.S.G. § 3A1.2(c)(2).   Mr. Saleh objects to these enhancements.   While Mr. Saleh was certainly aware that his conduct created a *risk* of bodily injury, Mr. Saleh did not believe, and did not have a reasonable cause to believe, flailing his arm with a makeshift knife through the food-tray slot of his prison door would create a *substantial risk* of bodily injury.   Additionally, a review of the surveillance video of the incident casts significant doubt on the actual severity of the officer's injuries.   <u>See</u> Exhibit B (provided to the Court by mail).

The Sentencing Guidelines explain that in relation to offenses such as Mr. Saleh's, a 3-level enhancement is warranted if "bodily injury" occurs whereas a 5-level enhancement is warranted if "serious bodily injury" occurs.   <u>See</u> U.S.S.G. §§ 2A2.2(b)(3)(A), 2A2.2(b)(3)(B).

The assault occurs at the approximate 0:00:25 point in the surveillance video (Exhibit B) and the officer's reaction is shown immediately thereafter.   At no point does the officer react as if he has received a "*serious* bodily injury" rather than merely a "bodily injury".   His response is to step back, look briefly at his right wrist or forearm, then calmly steps forward, close and lock the food-tray slot on Mr. Saleh's door, and then calmly walk away pushing the food cart in front of him.   At no point does the officer appear to be in great pain or to have been seriously injured. Indeed, he was carrying the keys to Mr. Saleh's cell in his right hand and uses his right hand when he closes and locks the food-tray slot.   This minor fact is significant because he displays no difficulty or pain in doing so – which runs in stark contrast to his present claim that he received permanent nerve damage.   <u>See</u> PSR ¶ 31.

5

These distinctions – "risk" vs. "substantial risk" and "bodily injury" vs. "serious bodily injury" – control whether the 6-level and 5-level enhancements apply.  Mr. Saleh respectfully submits that only a *risk* but not a *substantial risk* is all that was involved, and that only a bodily injury but not a *serious* bodily injury was all that was inflicted.  If this Court agrees then the 6-level enhancement should not be applied under U.S.S.G. § 3A1.2(c)(2), and only a 3-level enhancement rather than a 5-level enhancement should be applied under U.S.S.G. § 2A2.2(b)(3).[2]

Thus, with respect to Mr. Saleh's 2018 Indictment, the defense respectfully submits that the following Sentencing Guidelines calculation should be adopted by this Court:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2A2.2(a)): | 14 |
| Use of Dangerous Weapon (a knife) (U.S.S.G. § 2.2(b)(2)(B)): | +4 |
| Bodily Injury (U.S.S.G. § 2A2.2(b)(2)(A)): | +3 |
| Convicted under 18 U.S.C. § 111(b) (U.S.S.G. § 2A2.2(b)(7)): | +2 |
| Acceptance of Responsibility (U.S.S.G. § 3E1.1(a)): | -2 |
| Total: | 21 |

With an offense level of 21 and a Criminal History Category of II, Mr. Saleh's recommended sentencing range under the Sentencing Guidelines would be 41 to 51 months imprisonment.[3]

---

[2]    If this Court has any question regarding the level of risk or the severity of the injury, then Mr. Saleh would respectfully request a <u>Fatico</u> hearing be held on the issue.

[3]    Irrespective if this Court sentences Mr. Saleh on both indictments simultaneously or sequentially, Mr. Saleh agrees with the Government that his Criminal History Category is II in relation to his 2018 Indictment.  <u>See</u> Gov't Sent. Memo., dated, November 8, 2021, 18 Cr. 468 (WFK), Doc. No. 62, at 7.

IV.     **A sentence of no more than 300 months imprisonment is just and appropriate**

Although Mr. Saleh disputes the applicability of two Guidelines enhancements, there is no disputing the severity of the charges or the wrongfulness of his intent. There likewise can be no disputing that a significant sentence is warranted in this case. The question for this Court, however, is just how lengthy a sentence is needed to satisfy the purposes of sentencing, and for the reasons that follow we respectfully submit that an aggregate sentence of no more than 300 months imprisonment is just and appropriate for *this* defendant in *this* case.

No one can dispute that 300 months' imprisonment (i.e., 25 years) is a lengthy and substantial sentence. Indeed, 300 months would be equal to or lengthier than sentences imposed in this District on a regular basis involving far greater harm than alleged in either of Mr. Saleh's indictments. As this Court is aware, individuals charged with gang and organized crime related murders – be it MS-13, the Bloods, Crips, or even the Mafia – often receive sentences in this District in the 20 to 25-year range, even in cases where multiple murders are alleged. The harm resulting from Mr. Saleh's conduct is qualitatively less severe.

Indeed, no individual was harmed by Mr. Saleh's attempts to join ISIL or his words or attempted actions in support of ISIL. While his intent may have been wrongful, defendants are not punished for the wrongfulness of their thoughts but rather for the severity of their actions. Wanting or even attempting to join ISIL cannot be condoned, but his failure to succeed in joining ISIL as well as his failure to ever harm another individual in relation to such conduct, likewise cannot be ignored.

At the same time, we do not dispute that Mr. Saleh did indeed harm a corrections officer while detained at the MDC, an offense that carries maximum sentence of 20 years imprisonment on Count 1 of the 2018 Indictment and 5 years on Count 2. However, again, imposing a

maximum sentence would be disproportionate to the harm caused. Even assuming *arguendo* that the corrections officer suffered as severely as the Government claims, he did not lose his life or a limb, he has returned to work at the MDC, and makes no claim that he is unable to do so. Is punishment appropriate? Of course. But nothing about the severity of the harm justifies a sentence so severe that would render it unlikely that Mr. Saleh would outlive his aggregate sentence on both cases.

Then there is the question of Mr. Saleh's mental health. While the Government attempts to dispute it, little in Mr. Saleh's institutional conduct dispels Dr. Xenakis's conclusion that Mr. Saleh possesses a "Schizotypal Personality Disorder" "manifested by bizarre and odd thinking, unusual and idiosyncratic interpretation of events and situations, and episodic overwhelming distress and dysphoria," PSR ¶ 86, nor that Mr. Saleh possesses "Other Specified Schizophrenia Spectrum and Psychotic Disorder" "manifested by worsening intrusive thinking with hallucinatory quality, disorganized behavior, impairment in social, occupational, and other important functioning, and anxiety," as well as "Major Depressive Disorder, Moderate" "[m]anifested by depressed mood most of the day, hypersomnia, loss of energy and fatigue, psychomotor agitation, markedly diminished interests, and diminished ability to think," PSR ¶ 87.

We submit that there can be no more sensible explanation of Mr. Saleh's conduct – in relation to the 2015 Indictment, the 2018 Indictment, and all institution misconduct in between and ever since – than the existence of substantial impairments in Mr. Saleh's decision-making ability brought about by significant mental health impairments. If anything, Mr. Saleh's continued inability to adjust to imprisonment displays the depths of his disorders, warranting lenience and mental health treatment not the polar reverse.

At one point early in this case, the defense mitigation specialist asked Mr. Saleh what triggered him to risk everything to join an organization known for its brutality against innocent people. Mr. Saleh responded that he has always stood up for those who are less fortunate than himself and it hurt him to see the women and children in Yemen face systematic brutality. Such an answer is both noble and skewed. Noble in the effort to help women and children. Skewed in the conclusion that joining ISIL, an organization known for taking child bribes and all that entails, would ever satisfy such goals.

Prior to this case, it is our understanding that Mr. Saleh's family and others close to him failed to notice signs of mental illness or abnormal behavior. Mr. Saleh's father's enclosed letter of support that underlies his lack of awareness of Mr. Saleh mental illness while also emphasizing the support his family and friends nonetheless continue to possess:

> My name is Saleh Musa, I am the father of Ali Saleh. I work as a technician with Rapid Armor Located in Brooklyn, N.Y. and ATM World located in Queens, N.Y. for over 5 years. Ali has been living with me his whole life. He is a sweet, caring, and honest person… Never ever have I seen him doing any harm, or talk harm to anyone, He has never been in trouble with the law before…

Exhibit A at 1.[4]

Notably, however, lack of experience in dealing with mental illness often leads family members to ignore symptomatic behavior, at times attributing minor episodes to normal teen angst. Parents often will not recognize psychosis in their children as they believe it is something they can only be "born into." For males, psychotic illnesses and schizophrenias generally manifest in the late adolescence or early twenties. See Hafner H, Maurer K, Loffler W, et al.,

---

[4] Though we do not quote from the additional letters contained collectively in Exhibit A, we urge this Court to read each letter closely. Each provides a thoughtful explanation of who Mr. Saleh was prior to the commission of the instant offenses, the positive impact he had on those family and friends that knew him at that time, and the support he continues to receive from those closest to him.

*The epidemiology of early schizophrenia. Influence of age and gender on onset and early course*, *Br J Psychiatry Suppl.*, Vol. 23:29-38 (April 1994).

"Effective, prompt treatment of psychosis in the early stages may avoid a long duration of untreated psychosis, which is associated with a worse clinical and social outcome," Fleischhacker, Wolfgang, et al., *Schizophrenia—Time to Commit to Policy Change*, Schizophr Bull., Vol. 40, Suppl. 3, S-165-S194 (April 2014) (available at <http://https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4002061/#>) (listing sources), which is why experts heavily recommend early intervention, <u>see</u> Garey, Juliann. *Watching for Signs of Psychosis in Teens*, Child Mind Institute (available at http://childmind.org/article/watching-for-signs-of-psychosis-in-teens/). Mr. Saleh's psychosis, unrecognized and untreated, was left to fester, manifested into the terroristic persona evident upon his arrest, and since cascaded into the maladjusted inmate struggling on a daily basis to come to grips with clear and obvious mental health issues that continue to go untreated at the MDC.

Neither Mr. Saleh, nor his family, identified his illness before it was too late. Instead of cognitive therapy, his outlet was social media; expressing an acute sense of justice, misdirected as it was, and communicating with recruitment specialists whom he idolized. Research has shown that " '[t]he duration of untreated psychosis does actually seem to affect the course of the illness….' The longer the illness goes untreated, the greater the chance that it will cause serious disruption in all areas of the patient's life." <u>Id.</u> Undiagnosed individuals' first episodes of psychosis generally land them in a hospital, or worse, a jail in Mr. Saleh's case.

To give perspective, of 191 instances of first episode psychosis hospital admissions, 70% of patients were arrested, and 59% had been incarcerated, prior to their first hospitalization or treatment for the illness. <u>See</u> Pope, Leah G., and Stephanie Pottinger. *First-Episode Psychosis:*

*Considerations for the Criminal Justice System*, National Association of State Mental Health Providers, at p.6 (available at https://www.nasmhpd.org/sites/default/files/DH-First-Episode-Psychosis-Considerations-Criminal-Justice-rev3.pdf). " 'Part of the issue here is we have turned jails and prisons into mental health hospitals, and they aren't mental health hospitals….' Instead of treating people with mental illness, prisons place them in solitary to get rid of them. 'They're burying them alive in the prison system.' " Corbett, Erin, *More Than 4,000 Prisoners With Serious Mental Illness Are Held in Solitary Confinement, Study Finds*, Fortune (October 10, 2018) (available at https://fortune.com/2018/10/10/mental-illness-solitary-confinement/).

It has been shown, and cannot be reasonably disputed, that long periods of solitary confinement worsen the symptoms of untreated psychosis. Mr. Saleh has been detained by the MDC in its SHU for reasons that were certainly brought upon by Mr. Saleh's own conduct, but those same actions while in such custody provide a clear display that the length of his detention in the SHU has exasperated his condition. A study of South Carolina prisons showed that inmates with mental illness are twice as likely to go to solitary and stay there for an average of 647 days. Ill-equipped to handle the mental stressors of solitary, Mr. Saleh has shown to be no outlier. See Bazelon, Emily, *The Shame of Solitary* Confinement, NY Times (Feb. 19, 2015) (available at https://www.nytimes.com/2015/02/19/magazine/the-shame-of-solitary-confinement.html).

Mr. Saleh's difficulty with coping mechanisms and a lack of meaningful social contact has led him to repeatedly violate terms of normal housing and find himself administratively sanctioned to the SHU for years to come. In the eyes of Mr. Saleh, however, negative human contact is better than no contact at all. Solitary confinement warps the psychology of an inmate – especially when that inmate has a serious, untreated mental illness. Confusion, insomnia,

hallucinations, paranoia and impulsivity are just a few of the negative psychological effects caused by solitary confinement, which is why experts have repeatedly shunned the practice.

> [P]rolonged segregation of inmates with serious mental illness violates basic tenets of mental health treatment. The mental health standards of the NCCHC include the "optional recommendation" that mentally ill prisoners be excluded from extreme isolation, noting in an appendix that clinicians "generally agree that placement of inmates with serious mental illnesses in settings with 'extreme isolation' is contraindicated because many of these inmates' psychiatric conditions will clinically deteriorate or not improve."

Metzner, Jeffrey, and Fellner, Jamie, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, Journal of the American Academy of Psychiatry and the Law, Vol. 38, No. 1, at 104-108 (March 2010) (available at http://jaapl.org/content/38/1/104) (citations omitted).  While Mr. Saleh has not been in solitary confinement for the entire duration of his time in the SHU, it has not been uncommon, and as this Court is aware the conditions of confinement in the MDC SHU are hardly rehabilitative irrespective of whether the inmate is alone in the cell or housed with one other inmate.

Absent from the PSR, and thus presumably absent from the Probation Department's consideration, are the absolutely abhorrent conditions of confinement that Mr. Saleh has been forced to endure during the past six years.  Your Honor is well-aware of the conditions of confinement that inmates have been subjected to at the MDC both prior to and during the COVID-19 pandemic.  However well-intentioned the measures were, the conditions exacted an immeasurable toll on Mr. Saleh and many of the other inmates.  Mr. Saleh has been detained in the MDC SHU for nearly six years through multiple blackouts, flooding and mold in his cell, lack of heat, and now, on top of that, for the past 19 months normal food service has been repeatedly interrupted which could not be supplemented by commissary, which was likewise

12

curtailed.  Days would go by, multiple times over a week, where inmates, including Mr. Saleh, were deprived basic sanitary conditions such as cleaning supplies for their cells – this despite COVID-19 raging alarmingly through the jails, and indeed even prior to the pandemic.

Judge McMahon described the conditions at the MCC and MDC during the pandemic in one case as "inhumane, cruel and harsh, and unreasonably unjust."  Transcript, dated, April 29, 2021, at 11, United States v. Days, 19 Cr. 619 (CM) (SDNY).  In another case, Judge McMahon restated her concerns, describing the "inhumane conditions" at the MCC and MDC as "conditions that should not exist at any incarcerative facility in the United States of America," harshly condemning the MCC and MDC as "prisons of which this country should be massively ashamed."  Transcript, dated, May 5, 2021, at 12, 16, United States v. Nunez, 19 Cr. 691 (CM) (SDNY).  Other judges have weighed in as well.  Indeed, Judge Oetken ruled that "because it's been harsher than a usual period that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served.  So I think having served 24 months is equivalent to having served three years.  That's what I believe in terms of how punitive it's been and how harsh it's been."  Transcript, dated, April 2, 2021, at 17-18, United States v. Gonzalez, 18 Cr. 669 (JPO) (SDNY).

Here, Mr. Saleh has been confined at the MDC since September 17, 2015 – over six years, or, by Judge Oetken's measure, the equivalent of approximately nine years for which that additional time should be incorporated into a determination of the appropriate sentence in this case.  See also United States v. Juan Carlos Aracena de Jesus, 20 Cr. 19 (PAE) (SDNY July 1, 2020) (substantial downward variance from 30 to 37 months to six months in part because of the "horrific conditions" at MCC during the pandemic); United States v. Morgan, 19 Cr. 209 (RMB) (SDNY May 5, 2020) (cutting the sentence to less than half of the low end of the Guidelines

based in part based on conditions at MDC during the pandemic and condemning the conditions at MCC and MDC *even prior* to the current crisis); <u>United States v. Dayss</u>, 19 Cr. 863 (VSB) (SDNY May 4, 2020) (reducing the length of the sentence in part based on conditions at MCC during the COVID-19 crisis); <u>United States v. Pierson</u>, 14 Cr. 855 (LTS) (SDNY May 4, 2020) (same for defendant detained at MDC).

We do not dispute the disciplinary struggles that Mr. Saleh has had while detained at the MDC, but the treatment he has received cannot be justified by anything he is alleged to have done.  As this Court is reported to have stated about the care received by inmates detained at the MDC, "I don't care if the defendant is Jack the Ripper, we treat people under our care with respect and decency, because it reflects on the entirety of the criminal justice system," <u>United States v. Rivers</u>, 18 Cr. 192 (WFK) (EDNY), Transcript, dated, July 27, 2021, at 9, "This is a disgrace.  It's an ongoing disgrace," <u>id.</u> at 7.

Although the Government and the Probation Department have not relied upon it, a recent incident involving the defendant also indicates the disproportionate manner in which defendants are treated at the MDC in juxtaposition to how they are expected to behave.  On October 6, 2021, Mr. Saleh was being frisked outside of his cell with his hands cuffed behind his back.  During the frisk, a corrections officer with whom Mr. Saleh had a long history of negative verbal interactions, either intentionally threw or unintentionally dropped a prayer book that Mr. Saleh had been carrying under his waistband.  This upset Mr. Saleh so Mr. Saleh kicked the officer as the officer was standing behind him.  The officer responded by throwing Mr. Saleh against the metal door to his cell so hard that he to be transported to an outside hospital.  Mr. Saleh's injuries included two puncture woods in the skull ███████████████████████, and substantial swelling of his face that impacted his ability to eat and speak.

When defense counsel visited Mr. Salah a week later, on October 14, 2021, Mr. Saleh's face and jaw were still noticeably swollen and his demeanor gave off the impression that Mr. Saleh may have been suffering from the after-effects of a concussion. ██████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ Obviously, Mr. Saleh over-reacted to his prayerbook being thrown or dropped on the floor but such over-reaction is consistent with his mental health disorders.   The correction officer's response, however, is jarring and likewise of great importance.

In relation to Mr. Saleh's 2018 Indictment the Government is asking for a Guideline sentence within the range of 97 to 121 months' imprisonment, to be imposed consecutively to any sentence on the 2015 Indictment, for a cut on the wrist; we ask for a downward variance since, in addition to the other reasons discussed herein, Mr. Saleh received far worse at the hands of those individuals whose job description and responsibility are to protect from harm those inmates who are under their care.

To be sure, an inmate's future in the penal system does not look bright, and for an inmate like Mr. Saleh, unless this Court intervenes in some way, it would be reasonable to assume that Mr. Saleh will be designated to ADX Florence in Florence, Colorado, in which he would serve the entire duration of his sentence in solitary confinement under conditions stricter than even those in the MDC SHU.   While Mr. Saleh serves his sentence a foremost concern should be stabilizing his mental health so that he does not continue to recidivate, and so that he receives therapy rather than mistreatment or abuse.   Solitary confinement and SHU placement does the adverse; failing to mitigate the disease and offering few transitional services to aid in his

15

rehabilitation. Instead of being afforded the time to reflect on his mistakes and learn to cope with the disease that plagues his mind, Mr. Saleh is indirectly guided toward further transgression by the continuing nature of his enhanced detention. Yet, we respectfully submit that Mr. Saleh should not be viewed as a *"troublemaking inmate"* – his infractions should be viewed for what they more truly are: cries for help.

## V.   <u>Conclusion</u>

This case presents a situation where the defendant has been convicted of very serious crimes, and Mr. Saleh stands prepared to accept whatever sentence this Court deems appropriate. The question, however, is how lengthy must the sentence be to be sufficient, but not greater than necessary, to satisfy the purpose of imposing the sentence in the first place?

We respectfully submit that an aggregate sentence of no more than 300 months imprisonment between both Indictments is appropriate for this defendant in this case. Such would be a reasonable and modest variance from his recommended sentencing range under the United States Sentencing Guidelines – a sentence that nonetheless remains a lengthy and substantial sentence that would provide appropriate deterrence from future crimes.

We submit that a term of no more than 300 months imprisonment is appropriate when one balances the severity of the offense with the substantial mitigation discussed herein, which favors a reasonable, tempered, approach to a determination of Mr. Saleh's sentence. Likewise, we submit that such a term of imprisonment would be consistent with the needs of sentencing outlined in 18 U.S.C. § 3553(a), and would be sufficient, and not greater than necessary, to achieve those goals.

Finally, we ask that this Court designate Mr. Saleh to a facility with mental health programs that he could participate in, assuming they exist, so that his potential for rehabilitation and redemption may be fostered.

Dated: New York, New York
        November 10, 2021

                                    Respectfully submitted,

                                    /S/

                                    Michael K. Bachrach
                                    Anthony L. Ricco
                                    Steve Zissou
                                    *Attorneys for Defendant Ali Saleh*

# **Exhibits**

**Exhibit A**

April 1, 2019

To Whom it May Concern:

My name is Saleh Musa, I am the father of Ali Saleh. I work as a technician with Rapid Armor located in Brooklyn, N.Y. and ATM World located in Queens, N.Y. for over 5 years. Ali has been living with me his whole life. He is a sweet, caring, and honest person I have ever known. Never ever have I seen him doing any harm, or talk harm to anyone. He has never been in trouble with the law before.

So many times, we hear about the kindness he has done for his close family, friends and even random strangers. One time while he was working, he heard a lady crying that she lost her paycheck so he borrowed money from the store and handed it to the woman. He later repaid the store the amount he took.

Ali was always caring even towards those he worked with. Once he was working at a deli and they had too many workers so the manager wanted to fire an old worker. Ali volunteered to leave and find another job elsewhere to save that worker because he was old and was trying to provide for his family.

Once when Ali was younger, he was playing with his siblings in the yard. A neighbor came to the yard and collapsed on the ground. Ali came inside and started screaming to help the man and call 911. Fortunately, the ambulance came and took the man to the nearest hospital.

Another time, Ali was working with his uncle in Indiana. And whenever they were hungry, they would order food. But, one of the workers preferred to save up his money and not order anything, so Ali decided to share his food with him.

Whenever Ali would find time to visit his grandma and aunts, he would sit down and chat with them and have long conversations. And when it was time to go home, he would give them some money before he left.

There is no one who encountered Ali but doesn't have something positive to say about him before this this instance. Ali was kind to anyone and everyone. I can proudly tell you many more things he has done to help those who are in need. Everyone loved him. Thank you for your time.

Yours Truly, Saleh Musa.

**Exhibit A, Page 1 of 12**

**Exhibit A**

To Whom This May Concern,

My name is Saleh Ahmed and I am a Sheet Metal Worker for Local Union 28. I am happily married to the love of my life with three kids. Two girls, ages 3 ½ and 1 ½ and a boy, age 8 months. Ali Saleh and I are the same age with a couple of months apart. We were practically born and raised together. We started as little kids growing up together because we were neighbors and from there we went to the same schools. From elementary to middle to high school and even when we were in Yemen we went to the same school.

To be honest I was never really a school person but with Ali there I was kind of excited to go to school so I can be with my best friend. Fast forward a couple of years and he we were in high school. We would of some classes together and that was the best part of high school. Most of my time in high school I would cut class and sometimes wouldn't even go to school until one day Ali pulled me over and we had a talk about our future. He told me that if I keep cutting classes I will end up like my father in the deli working all my life with no real benefits and with a job I will hate and be forced to work for the rest of my life. Ever since that day I changed my attitude and pushed myself in class and did my best. If it wasn't for him, I don't know where I would have been now.

My parents would always tell me why can't you be more like Ali and stay in class and hit the books rather than the park. They always told me the park will be waiting for you, but school is where your future is. My parents admired him so much for the way he carried himself. Anytime I would go out my parents would tell me where I was going, and I'd say park or movies or friends from school and they'd tell me be home by 8pm. Whenever I said I was with Ali they wouldn't tell me anything. They knew I was in good hands.

Believe it or not I am where I am in my career in life all thanks to Ali. He helped me through projects, essays, test and region exams. He is that kind of person if he can help you in any way, he possible can he will. I also remember a day when we use to work in bodegas, we would work on the weekends and holidays. We used to have the same shift but in different store that were kind of close. We would drive together; I would drop him off by his store then I'd go to mine. One day I drop him off then I go to pick him up because we finished our shift. He calls me and tells me don't pick him up he's working a double cause someone wanted off so he can spend time with his family for the holiday. Ali didn't mind, that's how pure and kind his soul is. So, he ended working his shift(12hrs), the other guys(12hrs) and then his again(12hrs). He pulled a 36 hour shift all because an employee can spend some time with his wife and kids.

I can never really thank him for all he has done for me. The best I can do right now is write this letter to show you the real Ali, the kind hearted, pure soul, honest and loved person he is. I am writing this letter on April 30, 2019 because I need to. I need to show you what he has done for me and my family. A man's life depends on this letter and if it can help him the way he helped me I would write many more. He deserves a second chance. He is not the way people describe him in the papers and on the internet. You have to know him like I do,

**Exhibit A**

his made mistakes but don't we all, that's what being human is. Learning from your mistakes and becoming better. I really hope this letter helps a great person and my best friend in life.


Sincerely,
Saleh Ahmed

**Exhibit A**

**Ahlame Ahmed**



To: Whom it may concern,

   My name is Ahlame Ahmed and I am Ali Salehs maternal aunt. I have known Ali all of his life. In fact, we grew up together. We are only a few years apart and it always felt like we were siblings. I would like to take this time to tell you a little bit about Ali. I remember as kids we were always having fun when Ali was around. He was very competitive as a child, weather it was playing dodgeball, basketball, racing, climbing or riding bikes you name it Ali did it and the best to his ability. Growing up Ali was the funniest kid on our block. I remember he had so many friends as a child and everyone was all ears when he opened his mouth to speak. He was so amusing and would often keep everyone entertained with his jokes. He was what most would call 'the life of the party', and lit up every room he entered.

   Ali is very caring and loving. After I got married and moved out, Ali has always stayed in touch with me. With his kind and nurturing nature he would often check up on me to see how i was doing. Weather it was a "hi Ahame how are you?" left in my voicemail or a phone call or a visit to my house which he often did when he was around, his loving character always made me feel loved and cared for. He has even sent me letters from detention.

   Ali is one of the most generous souls i know. When he was working in Indiana he would come back and visit his family whenever he could, always making sure to come see me and my kids. Although, at that time he was making very little he would always bring all sorts of snacks and drinks for me and my children and when he would leave he would give me whatever little money he had. Even though I would tell him I wasn't taking any money from him, he would insist and leave the money. The last time I saw Ali, was the friday before he returned to Indiana for the last time before his arrest. He brought cookies, fruits and drinks for my kids and left $60.00. As he left, my son ■■■ cried for him to stay, so he took him along with him on a short walk, not knowing it would be the last time we would all see him, I often beat myself about it wishing I had forced him to stay longer. Even though he insisted he

**Exhibit A**

had to go I wish I could go back in time and hold him a little longer. It actually breaks my heart. Ali was generous even when he didn't have the means to be. He would give whatever little he had.

When I think about Ali and his present situation it tears me apart. I can't help but cry as I'm writing to you. Ali is the most funniest, kindest, hard working man I know. He would always look at the positive side in whatever situation he was in, weather he was sick or missed a flight he was  always positive. Always making us smile with his jokes. I remember When he was attending college, at the City College of New York, it was very far from his home. Often times, he told me he would spend more time on the train than in the college. Especially on the days when he had only a few classes. However, he would wake up early and persevered regardless. He did however, have to take a break from college and find a job. Which is when he moved to Indiana to work in a fastfood restaurant which did not serve pork.

If someone forewarned days before Ali's arrest, that he would be arrested in the future, I wouldn't have believed it. I along with many friends and family was in shock when I discovered he was arrested. Ali is the type of person that would go out of his way to help anyone who was struggling or in need. Weather it was helping strangers on the street or lending a hand to his mom or grandmother.

I recall as a child Ali had gained a lot of weight at some point and in his teenage years he was determined to lose it. With his hard work and determination he lost all the excess fat and became almost unrecognizable with his new fit body. Ali is full of so much potential and it's sad to think about him being sent away. Please hear Alis story with an open mind. He is the sweetest most caring person and doesn't deserve to be isolated from the rest of us. He deserves another chance at life. Ali is young and full of potential, honesty, generosity, kindness and resilience. He was always taking care and playing with my children and it breaks my heart when they often ask about Ali. He is missed dearly by his friends and family.

Sincerely,

**Ahlame Ahmed**

**Exhibit A**

Amel Ahmed



April 1, 2019

To Whom It May Concern:

I am writing this letter on behalf of Ali Saleh, my oldest nephew. My name is Amel Ahmed and I was raised in the same household as Ali. I am therefore intimately acquainted with Ali. I am a law school graduate and practicing journalist. I am currently working as an associate producer for an upcoming HBO documentary on Nigerian asylees living in Harlem. I also happen to be a Shiite Muslim, a sect that Sunni fundamentalist groups believe are infidels. I also do not wear hijab and live a pretty liberal lifestyle. Given my personal, educational and professional background, I do not submit this letter without understanding its significance and weight.

I have always been close to my nephew Ali. Up until a few months before his arrest, we were discussing his potential reenrollment at LaGuardia community college. You can imagine the shock and devastation our family felt in 2015 when we learned that we lost Ali to ISIS propaganda on the web. The news was particularly shocking given that Ali has never once judged me, my beliefs, or lifestyle. To the contrary, when I received my acceptance letter to law school, Ali spent a huge portion of his summer earnings to buy me a gift— a $2,000 Sony laptop. I made him return it because I could not in good conscience accept the expensive gift knowing how early he would wake up to work in the family grocery store.

Ali purchased that gift because he was proud of his aunt, the first and only female in our family to make it to graduate school. That's a far cry from the ISIS archetype fighting in Syria. Meanwhile, Ali was struggling in school. He grew increasingly alienated and unfortunately, found validation in the darkest parts of the web. As all this was happening unbeknownst to me, he expressed a strong interest in reenrolling in college. He was obviously confused and torn between worlds. His internal struggle strongly indicates to me that the supportive, loving, and aspirational Ali I know, still exists within.

Approximately six months before Ali was arrested, he and I discussed his potential reenrollment at LaGuardia community college. He expressed concern that his previous student debt would prevent him from enrolling again. I promised to help him with the application process but unfortunately, I never followed through. I regret that now. Ali meanwhile was isolating himself from the rest of us and had moved to a conservative Muslim community in Indiana. It was there that he allegedly spent hours on his computer reading ISIS propaganda.

**Exhibit A**

Ali's path is not unlike hundreds of other American youth radicalized on the web. Taken out of the same playbook, ISIS recruiters deliberately targeted young disenchanted Muslims in the West. I also firmly believe Ali suffers from mental health issues, including depression.

Along with Ali's case, I have been following a group of Minnesota men who were convicted of similar charges. Their ages ranged from late teens to early 20s. Michael J. Davis, the federal judge who presided over the high-profile cases, found himself conflicted during the sentencing phase. In interviews, he said the defendants appeared to be malleable youths who'd been ensnared by sly recruiting tactics.

Like Ali, the men spent hours online watching slick Islamic State productions that focused on the suffering of Syrian children and the moral corruption of the West. And knowing my nephew Ali, he has been deeply impacted by the suffering of Muslim populations abroad. If you want to understand Ali, then it's critical to see his rage through the lens of perceived injustices committed against Muslim populations.

In the case of the Minnesota youth, Judge Davis began to research whether there are effective therapies for reforming extremists. According to Wired magazine, "He hoped to find a credible way to transform Yusuf and his friends back into the ordinary young men they'd once been. This could spare the youths years behind bars—an act of compassion that would undermine the Islamic State narrative that the West despises its Muslim citizens."

But Judge Davis also understood that he would need to present deradicalization as something rooted in evidence, not just optimism. So, in 2016 he created the "Terrorism Disengagement and Deradicalization Program," the first government initiative of its kind in the US. Its mission statement read, "Untreated radicalized individuals will infect communities and continue to seek opportunities to harm others and martyr themselves."

The program was run by parole officer Kevin Lowry and its objective was to assess each man's potential to be rehabilitated. Judge Davis agreed to give the counseling team great weight as he considered what sentences to hand down.

One of those men included Abdullahi Yusuf. Judge Davis ruled that Yusuf would spend up to a year in a halfway house, followed by two decades of supervised release. If he kept up with his counseling and didn't break any laws, he would never return to prison.

According to Wired, "His redemption would affirm that those naive enough to join what are essentially death cults should never feel like all is lost, and that American society should think twice before treating them as such."

Yusuf would go on to spend a year in a federal halfway house, reading philosophy and literature, writing essays and reflecting on his life and his future. He was encouraged to debate with mentors and Muslim community leaders. For the next 20 years, he will be closely monitored by the authorities and he has restrictions on internet use. Like Ali, Yusuf aspires to go to college. Since being entered into the counseling program, Yusuf (who is barred from talking to the press) has already completed his high school diploma and performed community service.

**Exhibit A**

Jean Brandl, one of the lawyers on Yusuf's defense team, described his transformation as incredible in a 2018 interview with The Guardian. "He went from being a surly, closed-down kid to this really open, warm, intelligent, thoughtful, introspective young man, who recognizes why he'd been attracted to Isis and why there are so many other options for him." The alternative would have been to let Yusuf rot in prison, a decision that countless studies have shown would have likely left him worse off than when he first entered the system.

This letter is intended to be a simple request to have Ali undergo a similar type of counseling and assessment to see if he has the potential to be reformed. Ali is young enough where his future can be salvaged. At worst, Ali is found incapable of being reformed and he joins the prison system with thousands of others. At best, one man's life is salvaged.

Jessica Stern, a professor at Boston University specializing in extremism, has urged for the creation of such deradicalization programs in prison. "Some kids are almost living in a different world from their parents and then they are stolen away to be used as cannon fodder in someone else's war. It's heartbreaking," Stern said in a Wired interview. The Ali I know was abducted on the web by savvy recruiters who exploited his frustrations with his personal life.

I went to law school and entered the journalism profession because I believe in the ultimate good of our society and its laws. And while we may not as citizens always agree with the current political tides, our collective faith in the underlying system is what makes this country so special. Judge Davis saw in these cases an opportunity to put our best foot forward as a democratic society. I humbly ask that you simply consider this alternative as the benefits outweigh the risks. And I will ultimately respect whatever decision you make.

Thank you for your time and consideration,



Amel Ahmed

**Exhibit A**

March 20, 2019

To Whom it May Concern,

I am Aneesa Ahmed, the sister of Ali Saleh. I am a housewife living with my husband and 3 children. I am also the oldest child from my siblings. I'm writing this letter to let you know about my brother. Ali is a very nice and caring person. Every day he would ask about the wellbeing of me, my mother, grandmother and everyone from the family, his friends and their family, and his workers. He would ask if anyone needs help financially or if he can do whatever it takes to help ease their burden. He was very generous and never stingy. I remember when it was the Muslim holiday, Eid, he was working in Indiana and he sent money for me, my mother, grandma and his aunts as a gift from him. He would try his best to come visit New York as much as he could to see the family. He loved playing with my children, his only niece and nephew. And loved playing with our little cousins. If he couldn't make it to New York then he would call the house number to see how everyone was doing. He is the best brother anyone can ask for. He has not caused any trouble to anyone. He is a good kid. All his family, friends, teachers and workers have good things to say about him. I remember when he was working in New York he quit his job so that they wouldn't fire the other workers. He felt that the workers needed the job more than him because they were immigrants trying to provide for their family. And when he would go to his university, he would get calls from his workplace saying they needed help so he would skip his classes to help them. When he would come home from school or work after a long day, he never liked to complain. He would eat and chat about life and went to sleep never mad or upset with anyone. He was always content with whatever was happening in his life. Please don't lock him away. Give him another chance to turn his life around. His niece, nephews and cousins all miss him. We all miss him and want to see him free.

Aneesa Ahmed

**Exhibit A**

April 10, 2019

To Whom It May Concern,

 My name is Haleema Ahmed. I am the aunt of Ali Saleh. Inmate register number 86259-053. I have known Ali all my life. Ali is more than a nephew to me. We grew up together. He was more like a brother, and when my children were born he became an uncle to them. I still can't wrap my head around what happened to him. Where he is where he is now. A week before he was taken, I remember having a phone coversation with him. Telling me where he'd been and how he was in New York. Making jokes how his car broke down and he ended up giving the car to someone for free. I was telling him why he didnt sell it to him, he told me he seemed like a good guy. He just met the dude but he always saw the good in people.

 I remember when ever he would come over, the kids would go bonkers for him. My first born is named Ali so we all called him Giant Ali to differenciate and joke. He was always there for me and the children and still asks about them in his letters. He will always have a huge place in our hearts. Ali Ahmed is a kind, caring, sweet individual and anyone that met him can attest to it. He was always a peaceful kid and was never engaging in troublesome activities. When he wasnt working, he would hang with the family and play with the kids. All the kids loved him!

 When I moved to Buffalo at one point, he always kept in contact. Calling and asking about us. He was someone that always had a smile on his face. Always laughing and joking. I remember how he would always have time if anyone needed him. He would drop what he was doing and help. He would help anyone regardless if they were family. No matter who they were.

 I know my nephew Ali is still the same lovable boy from before. Still the caring, selfless man. When I read his letters I can still feel the love. He is still a young man and has a huge future ahead. I understand the seriousness of his case, but Ali has a clean record. I pray he comes back soon to us and the kids. They dearly miss their Uncle Ali. We all do. He will have our support, just like He had ours.

Sincerely,
Haleema Ahmed

**Exhibit A**

To Whom It May Concern,

My name is Entessar Abdulla and I am currently a second-year medical student. Before that I graduated with a degree in Biology and Psychology. I am married and have 2 boys, a 10-year-old and a 9-year-old. Ali Saleh and I were born and raised in the same apartment complex in New York City. His siblings and my siblings played together, went to school together, and basically grew up together, we always played in the backyard after school and we were pretty close. My family recently moved to Chicago in 2018, but before that we resided in that same apartment complex for the past 28 years. I left NY when I got married but I visited my family roughly 4x a year, every year, for 2 weeks since flights from Chicago to New York City were affordable. Every visit I would see Ali Saleh because he would hang out a lot with my brothers.

I remember reading a book in elementary school called Freak the Mighty, it was about two boys, Max, a large, slow, but kind-hearted boy, and Freak, who was physically handicapped but very intelligent. I thought of Ali as Max, he was bigger than the rest of us and was kind hearted. He never showed any disrespect to adults and his smile was contagious you couldn't help but smile with him. One time, my brother came home from school crying because some kid in his class bullied him a lot and it mostly happened after school away from teachers. Ali offered to go home with him and made sure that that boy never bothered him again.

I truly believe that Ali is honest, trustworthy, and caring. He used to work at a halal store and wouldn't make much because halal stores don't generally make revenue. Even though he worked long hours he didn't mind. I know his father wanted him to quit working there because the amount of work he was putting wasn't worth the amount he was getting paid. But he continued to work there because it was an honest job and he was making an honest living. It didn't shock me either when I found out he was going to college. A lot of our neighborhood friends decided not to go, including my brother and I knew he thought about his future wisely. But the thing that stands out about Ali to me is his compassion.

My mother was often the one who went grocery shopping for a family of 6 and that meant a lot of groceries so she would take a cart. A typical grocery shopping would be walking to the store, which would roughly be a 15-minute walk, buy a cart filled of groceries and would have to steer the cart back home. We lived in the third floor and she would have to carry those bags up and down 3 flights of stair and she made many trips. Whenever I was there I usually would help her. But on many occasions, Ali would be passing along and would always take the cart from my mother's hand and walk her home taking up all those bags of groceries and making sure she didn't carry any.

She always had good things to say about Ali, even telling my brothers to be more like him, which I can agree on. When the news broke out about his arrest, I was the one who told my mother and I'll never forget her reaction. She looked at me and said, "Ali… Ali Saleh". I nodded and she looked down at the kitchen table fiddling her fingers on left over poppy seeds from a bagel and tears flowing down her face. "Why is it always the good ones", she said before getting up and looking out the window. She loved Ali, we had a lot of friends come and go but he was one that she hoped we would be friends with forever. We weren't perfect, we had friends who probably weren't the best and she would let us know that, she wanted what was best for us, but she never said that about Ali.

**Exhibit A**


      I can never truly repay him for the kindness he showed my mother, but that's why writing this letter is important to me. I sit here, at my desk, April 13, 2019 at 8:41am writing this letter when I have 2 exams coming up that I need to focus on in order to pass the semester and a standardized board exam in May, so I should be studying. Yet, I need to write this letter. I choose to write this letter. This letter isn't for a grade, as that is the only reason I write nowadays, but for a life… for a second chance, and I hope this helps.


Sincerely,
Entessar Abdulla