

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DMP
F.# 2018R01492

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

November 12, 2021

By ECF

The Honorable William F. Kuntz II
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

        Re:    United States v. Ali Saleh
                  Criminal Docket No. 18-468 (WFK)

Dear Judge Kuntz:

      The government respectfully submits this letter reply to address two objections to the Sentencing Guidelines calculation that the defendant raised in his sentencing submission dated November 10, 2021. Specifically, the defendant objected to the inclusion of a five-level enhancement for the victim's "serious bodily injury" and a six-level enhancement for the defendant's actions creating "a substantial risk of serious bodily injury." For the reasons set forth below, the evidence overwhelmingly supports the application of each enhancement.

      A.   The Victim Suffered a Serious Bodily Injury

      The defendant disputes that the victim correctional officer suffered "serious bodily injury" based on the victim's reaction in the moments following the attack. The government respectfully submits that it is disingenuous for the defendant to claim that the victim did not suffer "serious bodily injury" when the defendant has received in discovery hundreds of pages of the victim's medical records documenting the severity of the victim's injuries, including surgery and extensive physical rehabilitation. Moreover, the defendant's argument ignores the definition of "serious bodily injury" in the Sentencing Guidelines, which includes any injury requiring surgery or physical rehabilitation.

      Guidelines Section 2A2.2(b)(3) includes an enhancement based on the seriousness of the injury suffered by the victim. The level of the enhancement ranges from

three levels for "bodily injury," five levels for "serious bodily injury," and seven levels for "permanent or life-threatening" injury.[1]

The Guidelines define "serious bodily injury" as any injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ or mental faculty, or that requires medical intervention such as surgery, hospitalization or physical rehabilitation. U.S.S.G. § 1B1.1, Application Note 1(M). In contrast, "bodily injury" is defined as any significant injury, such as an injury that is painful and obvious or for which medical attention ordinarily would be sought, while "permanent or life-threatening bodily injury" means an injury involving a substantial risk of death, loss or substantial impairment of the function of a bodily member, organ or mental faculty that is likely to be permanent, or an obvious disfigurement that is likely to be permanent. Id., Application Notes 1(B) & 1(K).

Here, the evidence overwhelmingly shows that the victim suffered a "serious bodily injury," both because of the level of protracted impairment that he suffered as well as the fact that the injury required both surgery and physical rehabilitation.

The medical evidence shows that following the assault on July 13, 2018, the victim correctional officer was seen the same day at the Metropolitan Detention Center's medical facility and then at an urgent care facility, where he received a tetanus shot.

On July 18, 2018, the victim visited a private medical facility complaining of "numbness and tingling in his right forearm area below the area where he was injured and involving the thumb and index finger." See Exhibit C.[2] A medical examination confirmed that the victim had "decreased sensation" in his right forearm "down to the thumb and right index finger." The victim was diagnosed with a nerve injury, and was told not to grab, push, pull, carry or handle anything with his right hand.

On August 1, 2018, the victim reported to a neurologist that he had "severe pain in the first three fingers of his right hand and weakness of his right grip," including pain lifting his daughter. A clinical evaluation noted that "[t]emperature, touch and vibration sensation are decreased over the first three fingers of the right hand." The neurologist diagnosed the victim with "right median traumatic neuropathy" and, among other treatment, referred the victim to a surgeon. See Exhibit D.

On August 27, 2018, the victim was diagnosed with "laceration of dorsal sensory branch of the radial nerve at distal right forearm" and referred for surgery. Indeed,

---

[1] A court may also apply a 4-level increase for injuries falling between "bodily injury" and "serious bodily injury" or a 6-level increase for injuries falling between "serious bodily injury" and "permanent or life-threatening" injury.

[2] Because the government's initial sentencing submission included Exhibits A and B, the government begins its exhibit numbering for this reply letter with Exhibit C.

the treating physician noted in all caps, "NEEDS SURGERY ASAP – URGENT."  See Exhibit E.

After visits with additional specialists on August 29, 2018, September 12, 2018, and September 20, 2018 revealed no significant change, the victim underwent surgery on his right forearm on October 12, 2018.  According to the surgeon's report, the victim was placed under general anesthesia, the forearm was cut open at the location of the injury, and the injury to the radial nerve was identified as a location on the dorsal side with a firm irregular surface of the nerve.  The injury also caused the nerve to attach to the fascia, or connective tissue, surrounding the nerve.  The surgeon performed a neurolysis of the nerve – i.e., deliberately cutting the nerve to relieve pain by interrupting the transmission of pain signals in the nerve – and then applied a 2mm tube around the area of the neurolysis.  See Exhibit F.  In preparation for his trial testimony, the surgeon explained that repairing a nerve is like trying to put a broken vase back together.  No matter how strong the glue or how careful the reassembly of pieces, the broken vase will never be as good as the original.  The same is true for the nerve repair – no matter how great the level of care, the victim's nerve would never be as good as the original.

On October 19, 2018, the victim was seen for a post-surgical follow-up.  The physical examination revealed that the victim continued to suffer from decreased sensation in his right hand, could not make a tight fist, and had a weak hand grip.  The physician restricted the victim to lifting no more than two pounds with his right hand, and limited his repetitive motion.  See Exhibit G.

After being cleared by the surgeon to begin physical rehabilitation, the victim began physical therapy on November 14, 2018.  He attended physical therapy multiple times a week thereafter.  Attached as Exhibit H are physical therapy treatment notes from 59 visits between November 14, 2018 and May 9, 2019, an average of approximately 10 visits per month, all of which the government produced to the defendant in advance of the scheduled trial on June 3, 2019.

The government notes that the attached materials include only a sampling of the defendant's medical records, and do not describe all medical visits or contain records of all medical visits between the time of the injury and the time of trial.

This medical evidence amply supports a finding by a preponderance of the evidence that the victim sustained "serious bodily injury."  There can be no dispute that the victim underwent surgery to repair damage to his nerve nor that the victim attended many months of physical rehabilitation following the surgery.  Given that the definition of "serious bodily injury" includes any injury that requires medical intervention such as surgery, hospitalization or physical rehabilitation, that definition is plainly met here.  And, in any event, the summary of the medical evidence of the injury to the victim's right hand also meets the definition of "serious bodily injury" in that the victim suffered the protracted impairment of a function of a bodily member or organ.

The fact that the correctional officer did not collapse or fall to the ground in pain at the time of the defendant's attack, as the defense contends, is not dispositive of whether the victim suffered "serious bodily injury." As the correctional officer was prepared to explain in trial testimony, he felt the injury as soon as it happened, when he glanced down at his arm. However, he stated that he could not show any weakness, because showing weakness in front of an inmate would make him a continuing target. Accordingly, he locked up Saleh's food-tray slot, walked down the hall, and turned the corner, after which he immediately proceeded to MDC's medical center to obtain medical assistance.

Indeed, this Court is amply familiar with examples of law enforcement officers who suffered serious or life-threatening injuries but which did not deter them from completing their duties, such as an agent who suffered critical wounds from a shootout but was able to return fire and then drive himself to the hospital before undergoing emergency life-saving surgery. An enhancement for the victim suffering "permanent or life-threatening injury" was appropriately applied in that case. See United States v. Ronnell Watson, No. 19-CR-004 (WFK) (E.D.N.Y. June 15, 2021).

For all these reasons, the Court should conclude by a preponderance of the evidence that the correctional officer victim suffered "serious bodily injury" as a result of the defendant's conduct, and should find that the five-level enhancement under Guidelines Section 2A2.2(b)(3) is appropriate.

B. The Defendant's Act Created a Substantial Risk of Serious Bodily Injury

The defendant similarly challenges the application of the six-level enhancement for creating "a substantial risk of serious bodily injury," arguing that the defendant "did not believe, and did not have reasonable cause to believe, flailing his arm with a makeshift knife through the food-tray slot of his prison door would create a substantial risk of bodily injury." (Def. Mem. at 5.) Again, the defendant ignores the language of the Guideline, which does not turn on the defendant's belief, and mischaracterizes the seriousness of the risk posed by the defendant's acts.

As relevant to this case, Guidelines Section 3A1.2(c)(2) provides for the six-level enhancement "[i]f, in a manner creating a substantial risk of serious bodily injury, the defendant . . . knowing or having reasonable cause to believe that a person was a prison official, assaulted such official while the defendant . . . was in the custody or control of a prison or other correctional facility." Under this Guideline, the issue is whether the defendant's actions created a "substantial risk of serious bodily injury," not whether the defendant believed that to be the case. The "knowing or having reasonable cause to believe" language applies only to whether the defendant knew or had reason to believe that the victim was a correctional officer, a fact not in dispute (as the defendant so acknowledged in connection with his guilty plea).

The Guidelines defines "substantial risk of serious bodily injury" to include (1) creating the risk of serious (or more than serious) bodily injury, or (2) actual serious

4

bodily injury (or more serious injury) if it occurs. U.S.S.G. § 3A1.2, Application Note 4(B). In other words, the enhancement applies either if the defendant's actions created a substantial risk of serious injury or if serious bodily injury in fact occurred. For the reasons already set forth above, the victim suffered serious bodily injury, meaning that the six-level enhancement for the defendant's act creating a substantial risk of serious bodily injury applies.

Even if the victim had not suffered serious bodily injury, the six-level enhancement would also apply because the evidence overwhelmingly shows that the defendant's actions created a substantial risk of serious bodily injury to the victim correctional officer.

First, and most significantly, the defendant used his knife to strike the correctional officer above the wrist where the radial artery is located. Severing the radial artery can result in unconsciousness in as little as 30 seconds and death in as little as two minutes.[3] That is why slicing one's wrists is a means of attempting suicide. That the defendant's actions were designed to achieve exactly this outcome is evidenced by his contemporaneous statement to the correctional officer: The defendant smiled at the correctional officer and stated, "I hope you die."

Second, to carry out this attack, the defendant constructed a deadly and dangerous weapon – a five-inch long homemade metal knife that contained a cloth handle, a cloth lanyard and a razor blade at the end. This was a weapon that the defendant could hold and control as he wished. Notably, even while disputing that the defendant's actions created a substantial risk of serious bodily injury, the defendant does not dispute that the knife constituted a "dangerous weapon" for which a separate four-level enhancement applies, pursuant to Guidelines Section 2A2.2(b)(2)(B). The definition of "dangerous weapon" is an instrument capable of or closely resembling an instrument capable of inflicting death or serious bodily injury. See Guidelines Section 1B1.1, Application Note 1(E).

Third, the defendant struck the correctional officer with the knife across the forearm above the wrist at the exact moment that the correctional officer was most vulnerable because he was not looking at the defendant's cell. Contrary to the assertion in the defendant's sentencing submission that the defendant's actions constituted "flailing his arm with a makeshift knife through the food-tray slot of his prison door" (Def. Mem. at 5), the video depicts a calculated and intentional effort by the defendant to target the correctional officer's forearm, lashing out at the exact moment that the officer's attention was diverted and using the blade in a single, swift motion to slice the correctional officer across the forearm above the wrist.

---

[3] See, e.g., "The Dangers From Knife and Weapon Slashing," Security Magazine (Jan. 23, 2019), *available at* https://www.securitymagazine.com/articles/89752-the-danger-of-slashing.

5

<u>Fourth</u>, and notably, this was not the defendant's first attack on this correctional officer. As reported in the PSR, during a previous incident on April 27, 2017, the defendant assaulted the same correctional officer by kicking him in the thigh and hitting him in the back of the head. (PSR ¶ 29). In other words, the defendant's acts were no mere crime of opportunity – the defendant specifically targeted this correctional officer.

Based on all of these facts, the Court can conclude by a preponderance of the evidence that the defendant acted in a manner creating a "substantial risk of serious bodily injury." As noted above, the fact that the victim sustained serious bodily injury also supports application of the enhancement for the defendant creating a substantial risk of serious bodily injury. Accordingly, the six-level enhancement under Guidelines Section 3A1.2 is appropriate and should be applied.

### C. The Court Should Receive the Victim's Medical Records Under Seal

The government respectfully requests permission to file the attached exhibits under seal. The underlying exhibits contain the personal medical records of the victim correctional officer, as well as reports of treatment by non-party medical providers. Given the privacy rights of these individuals, particularly in light of the fact that the relevant portions of these exhibits have been described and discussed in the course of this reply letter, the public right of access to the underlying reports and records is limited. <u>See</u> <u>United States v. Amodeo</u>, 71 F.3d 1044, 1050–51 (2d Cir. 1995) (recognizing privacy interests of non-parties as a valid basis for sealing).

### **Conclusion**

For the reasons set forth above, both of the disputed Guidelines enhancements apply and the correct advisory Guidelines range is 97 to 121 months' imprisonment. The government respectfully requests that the Court sentence the defendant to a sentence within this Guidelines range, to run consecutively to the sentence imposed for the terrorism matter.

Respectfully submitted,

BREON PEACE
UNITED STATES ATTORNEY

By:   /s/
Douglas M. Pravda
Assistant U.S. Attorney
Eastern District of New York
718-254-7000

cc:  Clerk of Court (WFK) (by ECF)
All Counsel of Record (by ECF)
Shayna Bryant, United States Probation Officer (by Email)