UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
UNITED STATES OF AMERICA,

   v.

ALI SALEH,

      Defendant.
-----------------------------------------------------------------X

**MEMORANDUM & ORDER**
18-CR-468 (WFK)

WILLIAM F. KUNTZ, II, United States District Judge:

On July 24, 2018, Ali Saleh ("Defendant") pled guilty, pursuant to a plea agreement, to two counts of attempting to provide material support to a foreign terrorist organization in violation of 18 U.S.C. § 2339B(a)(1). While in pretrial detention for that offense, Defendant violently assaulted a corrections officer resulting in a new prosecution for assaulting a federal correctional officer in violation of 18 U.S.C. §§ 111(a)(1) and (b) and possessing contraband in prison in violation of 18 U.S.C. §§ 1791(a)(2) and (b)(3). Defendant pled guilty to these charged on June 3, 2019. The Court now sentences him for the subsequent offenses and provides a complete statement of reasons pursuant to 18 U.S.C. § 3553(c)(2) of those factors set forth by Congress and contained in 18 U.S.C. § 3553(a). For the reasons discussed below, Defendant is hereby sentenced to 100 months of incarceration followed by three years of supervised release, served concurrently on each count; no fine; and a $ 200.00 mandatory special assessment.

## BACKGROUND

On July 24, 2018, Ali Saleh ("Defendant") pled guilty, pursuant to a plea agreement, to two counts of attempting to provide material support to a foreign terrorist organization in violation of 18 U.S.C. § 2339B(a)(1). While in pretrial detention for that offense, Defendant violently assaulted a corrections officer resulting in the instant prosecution for assaulting a federal correctional officer, in violation of 18 U.S.C. §§ 111(a)(1) and (b), and possessing contraband in prison, in violation of 18 U.S.C. §§ 1791(a)(2) and (b)(3). Defendant pled guilty to these charged on June 3, 2019. *See* Docket Entry dated June 3, 2019.

The Court hereby sentences Defendant and sets forth its reasons for Defendant's sentence using the rubric of the 18 U.S.C. § 3553(a) factors pursuant to 18 U.S.C. § 3553(c)(2).

## DISCUSSION

**I.  Legal Standard**

18 U.S.C. § 3553 outlines the procedures for imposing sentence in a criminal case. The "starting point and the initial benchmark" in evaluating a criminal sentence is the Guidelines sentencing range. *Gall v. United States*, 552 U.S. 38, 49 (2007). If and when a district court chooses to impose a sentence outside of the Sentencing Guidelines range, the court "shall state in open court the reasons for its imposition of the particular sentence, and . . . the specific reason for the imposition of a sentence different from that described" in the Guidelines. 18 U.S.C. § 3553(c)(2). The court must also "state[] with specificity" its reasons for so departing or varying "in a statement of reasons form." *Id.*

"The sentencing court's written statement of reasons shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)." *United States v. Davis*, 08-CR-0332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.). Section 3553(a) provides a set of seven factors for the Court to consider in determining what sentence to impose on a criminal defendant. The Court addresses each in turn.

## II. Analysis

### A. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The first § 3553(a) factor requires the Court to evaluate "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

#### i. History and Characteristics of the Defendant

Defendant was born on December 18, 1992, in Queens, New York. Presentence Investigation Report ("PSR") ¶ 69, ECF No. 133. He is one of four children born to the marriage of Saleh Musa and Fatimah Musa. *Id.* Defendant's father owns a grocery store

and works as security guard for a company that delivers money to automatic teller machines. *Id.* His mother is a homemaker. *Id.* Defendant has good relationships with his parents and they remain supportive of him despite his incarceration for the instant offense. *Id.* In telephonic interviews, Defendant's parents described him as "a good kid" and expressed a profound sense of sadness over Defendant's legal situation. *Id.* ¶ 70. Defendant's siblings are also aware of the instant offense and remain supportive. *Id.* ¶ 71.

Defendant described growing up in a home with basic necessities, free from any instances of abuse or neglect. *Id.* He graduated from Hilcrest High School in Queens in 2010 and attended the City College of New York between January 2011 and May 2011, when he was 21 years old. *Id.* ¶ 92, 93. Defendant attended LaGuardia Community College in Queens, New York, from March 2013 until June 2014. *Id.*

Prior to his incarceration, Defendant was employed as a deli clerk at his father's grocery store and as a cashier at his uncle's restaurant and was otherwise supported by his parents. *Id.* ¶¶ 94–98. Between December 2014 and July 2015, Defendant lived with his uncle, in Fort Wayne, Indiana. *Id.* ¶ 73. Prior to his arrest in this case, Defendant lived with his parents in Queens. *Id.* ¶ 74. Defendant is single, has never married, and has no children. *Id.* ¶ 72.

Defendant is generally in good physical health, other than minor health problems, including a vitamin deficiency and low blood pressure. *Id.* ¶ 81. During his incarceration for the instant offense, he has been treated in connection with a hunger strike and also taken to the hospital for a "drug overdose" that was deemed "accidental or unintentional." *Id.* ¶¶ 82–83.

Defendant has undergone comprehensive psychological evaluation since his arrest. *Id.* ¶ 84. The results of these evaluations have been inconclusive in determining Defendant's specific mental health issues. Defense counsel argues that Defendant's offenses result from "substantial impairments in Mr. Saleh's decision-making ability brought about by significant mental health impairments." *See* Def. Sentencing Memorandum ("Def. Mem.") at 8, ECF No. 65. *Id.* ¶¶ 84–90. Defendant declined psychological services while in prison. PSR ¶ 84.

    ii.   <u>Nature and Circumstances of the Offense</u>

On September 17, 2015, Defendant was arrested after repeatedly attempting to travel to the Middle East to become a foreign fighter for ISIS. *Id.* ¶ 94. On July 24, 2018, Defendant pled guilty to Counts Two and Three of a Superseding Indictment in Docket Number 15-CR-517. *Id.* ¶ 1. Count Two charges that in October 2014, Defendant, attempted to provide material support and resources, as defined in 18 U.S.C. § 2339A(b), including personnel, to a foreign terrorist organization, specifically, ISIS, in violation of 18 U.S.C. §§ 2 and 2339B(a)(1). *Id.* Count Three charges that between July 2015 and August 2015, Defendant attempted to provide material support and resources, as defined in 18 U.S.C. § 2339A(b), including personnel, including himself, to a foreign terrorist organization, specifically, ISIS, in violation of 18 U.S.C. §§ 2 and 2339B(a)(1). *Id.* Defendant has been in federal custody since his arrest on the terrorism charges on September 17, 2015. *Id.*

Defendant has been in pretrial detention at the Metropolitan Detention Center ("MDC") since September 2015. As detailed in the Presentence Report, Defendant has been cited on at least 100 separate occasions for committing disciplinary infractions, many of which involved acts of violence.

In October 2015, Defendant was cited for: giving/ accepting money without authorization because his personal identification number was used by another inmate to place calls; removing his handcuff from his left hand and slipping out of his waist chain and then attempting to conceal the restraints by covering his arms with a blanket; and refusing to consent to a visual search. *See* PSR ¶ 75.

In November 2015, Defendant was cited for: refusing to consent to a visual search and refusing to appear at his disciplinary hearing; being unsanitary and untidy and refusing to obey an order for refusing to comment during his disciplinary hearing; being disruptive and barricading his cell window with his mattress in order to obstruct the view of his cell from staff; disobeying staff when they asked him to remove the obstructions; and hitting the duress alarm button and jamming the alarm button in the Special Housing Unit ("SHU"). *Id.*

In December 2015, Defendant was cited for multiple instances of refusing to attend his disciplinary hearing and refusing to be searched in the MDC SHU. *Id*

In June 2016, Defendant was cited for failing to stand for a prison count and refusing to obey an order to do so; refusing to obey an order because he was found in a common area with a sweatshirt and a sheet wrapped around him; being in an unauthorized area during a lock down drill; refusing to remove sheets of paper from his cell window; blocking his cell window and cell slot with paper in order to obstruct the view from staff, refusing to remove the paper when ordered to do so, and not complying when asked to submit to restraints; and activating the SHU duress alarm multiple times when there was not an emergency. On one occasion, BOP staff found Defendant's food slot open. As the BOP officer began to secure food slot, Defendant charged the food slot from the back of his cell which resulted in the bar smashing into the officer's knee multiple times. When Defendant was ordered to stop movement, he refused to do

5

so. Several minutes later, as BOP staff were attempting to photograph the cell, Defendant kicked the BOP officer in his midsection, which resulted in redness and swelling to his torso. *Id.*

In July and August of 2016, Defendant was cited for: refusing to attend his disciplinary hearing multiple times; covering his cell window in the SHU, refusing to remove the covering, and jamming the food slot with a plastic bag; covering his cell window in the SHU again; activating the duress alarm repeatedly; and kicking a BOP officer in the upper torso during a pat-down search. *Id*.

In September 2016, Defendant was cited for: covering his cell window in the SHU; refusing to attend his disciplinary hearing multiple times; breaking his food slot box multiples times; refusing to stop pulling on a light fixture while standing on the top bunk and attempting to kick BOP officers when they removed him and placed him against the wall; and destroying property valued at $100 or less for ripping the plastic covering of his mattress in the SHU. *Id*

In October 2016, Defendant was cited for: fighting with another inmate; refusing to remove a covering from his cell window; refusing to attend a disciplinary hearing; and destroying the light fixture in his room and removing a metal desk from the wall in the SHU. Additionally, Defendant was cited for banging on his cell window with a metal stool seat that he had broken off from his cell table, and damaging the food port lock on his cell door and shattering the glass window. Defendant, still holding the stool seat, told officers "I'm going to hit whoever comes in here with this." He continued to be combative and threatened to kick mdc officials as they subdued him. *Id*

In December 2016 and January 2017, Defendant was cited for refusing to remove paper covering his cell window in the SHU multiple times; refusing to attend his disciplinary

6

hearing multiple times; possessing a dangerous weapon, i.e., a broken piece of his plastic food tray in his hand; placing his arm inside the food slot in the SHU; and fighting with another person. *Id*

In April 2017, Defendant was cited for attempting to grab the duty belt of the officer through a food slot in his special housing unit cell; refusing to be placed in restraints multiple times; and kicking an officer in the thigh and hitting him in the back of his head during a routine pat-down search. *Id*

In June and August 2017, Defendant was cited for assaulting someone without serious injury multiple times; destroying property valued over $100 multiple times; refusing to obey an order; possessing a dangerous weapon; and fighting with another person. *Id.*

In September and October 2017, Defendant was cited for refusing to obey an order; assault multiple times, with and without a serious injury; interfering with taking count, setting a fire and possessing a dangerous weapon. *Id.*

In November 2017, Defendant was cited for destroying property over $100; and refusing to appear for his disciplinary hearing. Additionally, Defendant was cited for possession of a dangerous weapon, destroying government property, and tampering with security devices. Defendant covered his cell window in the special housing unit. BOP staff observed him banging and kicking on the door repeatedly. When he uncovered the window, he was in possession of a large metal object from the light fixture which he used to bang on the door. Defendant was thereafter placed in restraints and removed from his cell. Upon inspecting his cell, BOP staff observed that the security screws from the light fixture and light bulb were removed, and the desk attached to the wall was damaged. *Id.*

7

In December 2017 and January 2018, Defendant was cited for interfering with taking count; refusing to appear at his disciplinary hearing; destroying property; and assaulting someone without serious injury. *Id*

In March 2018, Defendant was cited for assault without serious injury multiple times. On one occasion, Defendant threw an unknown substance through an open food slot in his special housing unit cell. He thereafter refused to close the food slot and stated: "I want my sheet . . . I want my sheet." On another occasion staff observed Defendant attempting to destroy the ceiling tiles and light fixtures in his cell. When staff attempted to move Defendant to another cell, he became combative and struck an officer in the head and torso with a closed fist. He then refused to appear at his disciplinary hearing. Defendant was also cited for refusing a drug/ alcohol test.

On April 24, 2018, Defendant was cited for possessing a dangerous weapon and assault without serious injury. According to the BOP discipline hearing officer report, an inmate was observed with superficial lacerations on left forearm that were consistent with being cut with a sharp object. While investigating this incident, BOP staff discovered that Defendant had recently went through a metal detector, which revealed a 2-inch piece of aluminum metal located on his person, and it was determined that he used the metal object to assault the other inmate. Defendant then refused to appear at his disciplinary hearing. *Id.*

On July 13, 2018, Defendant committed violent assault of a federal officer at the MDC for which he is now being sentenced. PSR ¶ 26. In the afternoon that day, a male MDC correctional officer was retrieving garbage through an access slot of Defendant's cell, at which point Defendant reached his arm out through the slot, and slashed the officer with a metal object, lacerating the officer's right forearm. *Id.* After the slashing, Defendant smiled at the correctional officer and stated: "I hope you die." *Id.* Defendant's actions, including the slashing,

8

were captured on MDC surveillance video. *Id.* An hour later, MDC officers conducted a search of Defendant's person and escorted him to a holding cell, wherein they located a five-inch homemade metal knife, or "shiv," with a cloth handle and lanyard secreted inside Defendant's mattress. *Id.* ¶ 27. The MDC correctional officer sought medical treatment for the three-centimeter laceration on his arm, which included surgery on his radial nerve and physical therapy. *Id.* ¶ 28.

The victim reports that although he has returned to work at the MDC, the assault has greatly impacted him and he continues to suffer pain and undergo physical therapy. *Id.* ¶ 29. In response to a Victim Impact Statement questionnaire form, the victim wrote:

> This crime has affected me in numerous ways. I am reminded in every aspect of my life, mentally, psychically and financially. As a Law Enforcement Officer, I expected a certain amount of inherent danger, as danger is something that comes with the territory. However so, being stabbed by an inmate has caused me to have deep emotional distress. As a Federal Officer I pride myself with respect, I show respect to everyone no matter their situation. Inmate Saleh was someone I had a report with. And his actions have now made me paranoid, and scared. After the attack I spurned being touched by anyone, this included friends and family. This was particularly hard because I also became a father for the first time. As a result, relationships with family, friends, and my daughter's mother deteriorated. I became withdrawn and struggled with displaying any type of emotional and physical affection. Unable to identify what the defendant stabbed me with or how many other inmates used this same weapon to inflict harm on others, was another deep concern of mine. I struggled with the idea that I might have been exposed to communicable diseases such as HIV/AIDS. This also contributed to my depression. Discovering I had nerve damage in my right hand as a result of the attack enraged me. I wanted to hurt anyone that looked like Saleh. Especially because he stated "I hope you die!". I have sought counseling from the FBI's victims program. I am currently receiving counseling from [names deleted].

*Id.* ¶ 31. Defendant was federally charged for this offense on August 28, 2018 and has remained at the MDC where his violent behavior and disrespect for authority has continued unabated. Even after this assault, Defendant committed the following infractions.

9

In August, October and November 2018, Defendant was cited for refusing to obey orders; destroying property valued at $100 or less multiple times; and possessing a dangerous weapon. *Id*.

In March and April 2019, Defendant was cited for interfering with security devices; destroying property valued over $100; and possessing a dangerous weapon. *Id*.

In May 2019, Defendant was cited for: destroying property valued at $100 or less when he bent his handcuff and took it off. *Id*.

In February, March, and May 2020, Defendant was cited for possessing a dangerous weapon. *Id*.

In September, October, November, and December 2020, Defendant was cited for destroying property valued at a $100 or less; destroying property valued over $100 multiple times; possessing a dangerous weapon; assaulting without serious injury; setting a fire; refusing to obey an order and interfering with taking count. *Id*.

And most recently, from January to May 2021, Defendant was cited for assaulting someone without serious injury, multiple times; refusing to obey an order, multiple times; possessing a dangerous weapon; interfering with security devices, multiple times, refusing to obey an order, and destroying property over $100. PSR Addendum.

### B.   The Need for the Sentence Imposed

The second § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant

10

with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

The Court's sentence recognizes the seriousness of Defendant's offense and punishes Defendant accordingly. It seeks to deter Defendant from further criminal activity, from disregarding U.S. law, and from engaging in illicit activity.

### C. The Kinds of Sentences Available

The third § 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant. 18 U.S.C. § 3553(a)(3).

Defendant plead guilty to Count One of the Indictment charging him with Assault of a Federal Officer, in violation of 18 U.S.C. §§ 111(a)(1) and 222(b), and Count Two of the Indictment Charging him with Possessing Contraband in Prison, in violation of 18 U.S.C. §§ 1791(a)(2) and (b)(3). ECF No. 1.

By statute, Defendant faces a maximum term of imprisonment of 20 years on Count One. 18 U.S.C. § 111(b). He faces a maximum term of imprisonment of 5 years on Count Two. Pursuant to 18 U.S.C. § 1791(c), any punishment imposed shall be imposed to run consecutively to the terms imposed on Counts 2 and 3 of Docket Number 15-CR-517. Defendant also faces a term of supervised release of not more than 3 years on each count, 18 U.S.C. § 3583(b)(2); a maximum fine of $250,000.00, *id*. § 3571 on each count; and a mandatory special assessment of $100.00, 18 U.S.C. § 3013, on each count.

### D. The Kinds of Sentence and the Sentencing Range Established for Defendant's Offenses

The fourth § 3553(a) factor requires the Court to discuss "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[.]" *Id*. § 3553(a)(4)(a).

The parties disagree as to whether Defendant's total offense level in this case, Docket Number 18-CR-468, should be grouped with the total offense level in Docket Number 15-CR-517. While the instant case concerns Defendant's assault of a prison guard using a contraband knife, Docket Number 15-CR-517 concerned Defendant's attempts to join and support ISIS. Despite Probation's grouping of the total offense levels in the Presentence Investigation report, and defense counsel's desire to consolidate the proceedings, the Government notes they have not and do not consent to a consolidated proceeding. Gov. Mem. at 6–7.

The purpose of the grouping rules set forth in Part 3D of the Sentencing Guidelines is to prevent multiple punishments for substantially identical conduct. This is not the case here. Accordingly, this Court proceeds to sentence Defendant separately under each Indictment, and calculate the Guidelines range separately.

The applicable guideline for count one is USSG §2A2.2(a). That section provides a base offense level of fourteen (14). Since a dangerous weapon—a knife—was used to lacerate the officer's arm—four (4) levels are added pursuant to USSG §2A2.2(b)(2)(b). Since the victim sustained serious bodily injury, five (5) levels are added per USSG §2a2.2(b)(3)(b). Since Defendant was convicted under 18 U.S.C. § 111(b), two (2) levels are added per USSG §2A2.2(b)(7). Defendant was acting in a manner creating a substantial risk of serious bodily injury, and he was, knew, or had reasonable cause to believe that a person was a prison official, the defendant assaulted such official in a manner creating a substantial risk of serious bodily

12

injury, while the defendant was in the custody or control of a prison or other correctional facility. Therefore, the offense level is increased by six (6) levels per USSG §3a1.2(c)(2).

This results in a total offense level of thirty-one (31), as calculated by the Probation Department. The Government also credits Defendant with a two (2) level reduction for acceptance of responsibility pursuant to USSG §§ 3e1.1(a), resulting in a total offense level of twenty-nine (29), as calculated by the Government.

Defense counsel joins the Government in crediting Defendant with the two (2)-level reduction for acceptance of responsibility. However, Defense counsel also objects to the six (6) level enhancement, arguing Defendant knew his conduct created a "risk," but not a "substantial risk" of injury. Defense counsel also argues the five (5) level enhancement for "serious bodily" injury should be a three (3) level enhancement for "bodily injury," as the victim's injury should not appropriately be considered serious. Accordingly, Defense counsel argues for total adjusted offense level of twenty-one (21).

All parties agree that the offense level for Count Two (2)— possession of contraband in prison— is sixteen (16). Because sixteen (16) is less than the total offense levels calculated by all the parties for Count One (1), this has no effect on the combined offense level because Counts One (1) and Two (2) are grouped together pursuant to guidelines section 3D1.2.

Because probation groups the conduct for the offenses charged in this Indictment with Defendant's conduct charged in the Superseding Indictment in Docket Number 15-CR-517, Probation reports a criminal history category of six (VI), which is enhanced due to his terrorism offenses. Also, grouping both dockets for Guidelines calculation purposes results in a total offense level of forty (40), because it is the highest total offense level of all four Counts. Therefore, Probation's calculation using a total offense level of forty (40) and Criminal History

13

Category of six (VI) results in a Guidelines range for both dockets of three hundred and sixty months (360) to life. However, because of the statutory maximum sentence, Probation reports the effective guidelines range is three hundred and sixty months (360) to seven hundred and twenty (720) months of imprisonment, for the offenses in both dockets.

In contrast, the Government calculates Defendant's Criminal History category of II (2), because it does not believe the terrorism enhancement applies in this assault prosecution. A total offense level of twenty-nine (29) and a criminal history category of two (II), yields a guidelines range of ninety-seven (97) months to one-hundred and twenty-one (121) months of imprisonment. The Court hereby adopts the Government's calculation of the Guidelines range.

Pursuant to Defense counsel's calculation, a total offense level of twenty-one (21) and a Criminal History category of two (II), yields a guidelines range of forty-one (41) to fifty-one (51) months of imprisonment.

Additionally, the Guidelines suggest a term of supervised release of not more than three (3) years on each count; a fine of between fifty thousand ($50,000.00) dollars and five hundred thousand ($500,000.00) dollars; and Defendant is ineligible for probation.

Probation recommends a sentence of twenty (20) years of custody on count one (1), to run concurrently with the sentence imposed on Defendant in Docket Number 15-CR-517. They also recommend five (5) years of custody on Count Two (2), to run consecutively to the sentence imposed on Defendant in Docket Number 15-CR-517. Finally, they recommend three (3) years of supervised release on each count to run concurrently, and the special conditions outlined in the Presentence Investigation Report and Sentence Recommendation. PSR Sentencing Rec.

The Government recommends a Guidelines sentence of between ninety-seven (97) and one hundred and twenty-one (121) months of imprisonment.

14

Defense counsel does not ask the Court for a specific sentence on the Indictment in this case, but instead asks for a sentence of no more than three hundred (300) months on both this Indictment and the Indictment charged in Docket Number 15-CR-517.

### E. Pertinent Policy Statement(s) of the Sentencing Commission

The fifth § 3553(a) factor requires the Court to evaluate "any pertinent policy statement . . . issued by the Sentencing Commission." 18 U.S.C. § 3553(a)(5). In USSG §5K2.0, the Sentencing Commission outlines grounds for departure from a Guidelines sentence in some circumstances. Defense counsel argues that a downward departure from the Guidelines is warranted in this case for three primary reasons: "(1) Mr. Saleh has significant mental health issues, which would be better served by psychiatric treatment than prolonged incarceration or isolation; (2) while Mr. Saleh's custodial conduct has been far from stellar, such is the likely result of detaining a defendant with significant mental health issues in the SHU, often in isolation, for what has now been years on end, in a facility and unit that even for the most balanced inmate has been described by judges as "inhumane"; and (3) while the intent of Mr. Saleh's crimes were odorous, his ability to succeed at completing them was as disorganized, confused, and disconcerted as his mental processes." *See* Def. Mem. at 1.

Defendant further argues that 300 months, or 25 years, is a "lengthy and substantial sentence" and that "individuals charged with gang and organized crime related murders – be it MS-13, the Bloods, Crips, or even the Mafia – often receive sentences in this District in the 20 to 25-year range, even in cases where multiple murders are alleged." *Id*. at 7. He argues that Defendant's "institutional conduct" reflects "Dr. Xenakis's conclusion that Mr. Saleh possesses a 'Schizotypal Personality Disorder' 'manifested by bizarre and odd thinking, unusual and

15

idiosyncratic interpretation of events and situations, and episodic overwhelming distress and dysphoria . . .'" *Id*. at 8. Defense counsel claims this condition was exasperated by Defendant's placement in solitary confinement. *Id*. at 11.

Additionally, Defense counsel argues Defendant has been exposed to "absolutely abhorrent conditions of confinement" the past six years such as "multiple blackouts, flooding and mold in his cell, lack of heat" and most recently, disruption of food services and deprivation of "basic sanitary conditions such as cleaning supplies for their cells—this despite COVID-19 raging alarmingly through the jails . . . ." *Id*. at 13.

Defense counsel does "not dispute the disciplinary struggles that Mr. Saleh has had while detained at the MDC, but the treatment he has received cannot be justified by anything he is alleged to have done." *Id*. at 14. Specifically, Defense counsel calls attention to a recent incident in which Defendant, upset at his prayer book being dropped, kicked the officer who was standing behind him—an officer with whom Defendant had a history of negative verbal interactions. *Id.* Defense counsel states that "[t]he officer responded by throwing Mr. Saleh against the metal door to his cell so hard that he to be transported to an outside hospital. *Id.* Mr. Saleh's injuries included two puncture woods in the skull measuring approximately ½ cm – 1 cm, and substantial swelling of his face that impacted his ability to eat and speak." *Id.* In light of these circumstances, Defense Counsel argues a sentence of no more than 300 months imprisonment in this proceeding and the proceeding in Docket Number 18-CR-468 is sufficient, and not greater than necessary to achieve the goals outlined in 18 U.S.C. § 3553(a). *Id.* at 16.

In contrast, Probation provides that an upward departure may be necessary in light of Defendant's multiple violent assault against MDC officers while in custody, which he was not charged with in Docket Number 18-CR-469. PSR ¶ 116. Probation states that this constitutes

16

additional criminal activity for which Defendant is not held accountable in the advisory guidelines calculation, and may warrant an upward departure, pursuant to USSG § 5K2.21. Additionally, Probation notes that "because of the grouping rules, the additional conviction on the assault charges resulted in no change from the original advisory guideline range. *Id.* As a result, this range may not provide appropriate additional punishment for the assault conduct. *Id.* The Court may consider this as a basis for departure, pursuant to the Background in the Commentary to USSG §3D1.4." PSR. ¶ 17. Because the Court is conducting separate sentencings, this factor is not relevant.

### F. The Need to Avoid Unwarranted Sentence Disparities

The sixth § 3553(a) factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). For the reasons stated in this Memorandum and Order, and considering the other six § 3553(a) factors, the Court's sentence avoids unwarranted sentence disparities.

### G. The Need to Provide Restitution

Finally, the seventh § 3553(a) factor, which requires the Court to touch upon "the need to provide restitution to any victims of the offense," 18 U.S.C. § 3553(a)(7). Probation has noted that restitution is mandatory with respect to Count One (1), but has provided no additional details at this time.

## CONCLUSION

A sentence of 100 months of incarceration followed by three years of supervised release, served concurrently on each count; no fine; and a $ 200.00 mandatory special assessment is

appropriate and comports with the dictates of § 3553. This sentence is consistent with, and is sufficient but no greater than necessary to accomplish, the purposes of § 3553(a)(2).

The Court expressly adopts the factual findings of the Presentence Investigation Report and the addenda thereto, barring any errors contained therein, to the extent they are not inconsistent with this opinion. The Court also adopts the Special conditions recommended by Probation.

**SO ORDERED.**

**s/ WFK**
_____
HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: November 17, 2021
       Brooklyn, New York